Filed 8/30/23

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION FOUR

| | |
|---|---|
| THE PEOPLE, Plaintiff and Respondent, v. CECILIO CASTANEDA-PRADO, Defendant and Appellant. | A164897 (Sonoma County Super. Ct. No. SCR7368411) |

A jury convicted defendant Cecilio Castaneda-Prado of five counts of committing a lewd act on a child under age 14, as well as allegations that the charges involved multiple victims and substantial sexual conduct. The trial court sentenced Castaneda-Prado to 125 years to life, consisting of five consecutive prison terms of 25 years to life.

On appeal, Castaneda-Prado contends the court erred by excluding evidence that one of the children (a girl referred to in these proceedings as Jane Doe 2) believed that, by accusing Castaneda-Prado of sexual molestation, she was helping her mother obtain a "U visa," a type of visa that can provide legal status for victims of certain crimes who assist in the investigation of those crimes.[1]

---

[1] A U visa is "a temporary nonimmigrant visa" that provides "legal status for noncitizens who assist in the investigation of serious crimes in

1

We agree. Because the exclusion of this evidence violated Castaneda-Prado's right to confront a witness against him under the federal and state constitutions (U.S. Const., 6th Amend.; Cal. Const., art. I, § 15; see *Delaware v. Van Arsdall* (1986) 475 U.S. 673 (*Van Arsdall*)) and on this record cannot be considered harmless beyond a reasonable doubt (*Chapman v. California* (1967) 386 U.S. 18, 24 (*Chapman*)), we will reverse the convictions and sentences, and remand for a new trial.

## I. BACKGROUND

### A. *The Evidence Presented at Trial*

#### 1. The Prosecution's Case

Jane Doe 1 was born in January 2005, and Jane Doe 2 was born in April 2005.[2] They were close childhood friends. Castaneda-Prado's family was close with the girls' families, and they sometimes spent holidays together; the girls viewed Castaneda-Prado and his wife as parents or grandparents. Castaneda-Prado and his wife lived with their two older children in Santa Rosa. Castaneda-Prado's wife and children often babysat Doe 1 and Doe 2 at Castaneda-Prado's home when the girls were in elementary school.

At trial, Doe 1 and Doe 2 testified about incidents of sexual abuse by Castaneda-Prado. Doe 1 and Doe 2 could not remember the specific dates or times of the incidents, but they testified the abuse occurred when they were

---

which they have been victimized. (See 8 U.S.C. § 1101(a)(15)(U); [citation].)" (*People v. Morales* (2018) 25 Cal.App.5th 502, 506.) "[I]nformation . . . relat[ing] to an alien who is the beneficiary of an application for" a U visa is generally confidential. (8 U.S.C. § 1367(a)(2); see *Hawke v. U.S. Dept. of Homeland Sec.* (N.D. Cal., Sep. 29, 2008, No. C-07-03456 RMW) 2008 WL 4460241 at pp. **5–7.)

[2] Doe 1 and Doe 2 were 16 years old and in high school at the time of Castaneda-Prado's trial.

in elementary school (which ended when they were age 12).  Doe 1 believed she was in fifth or sixth grade and was older than 8 or 9 when the incidents occurred.  Doe 2 believed she was around 8 or 9 years old and in third grade when the incidents occurred.

One night, Doe 1 was sleeping on the living room floor at Castaneda-Prado's house when she awoke to Castaneda-Prado "[r]ubbing" "[t]he middle" of her vagina with his fingers.  Castaneda-Prado was on his knees in front of Doe 1 rubbing the inside and outside of her vagina.  Doe 1 had gone to sleep under a blanket while wearing a dress and underwear, but she found the blanket was no longer on her, her dress was pulled up, and her underwear had been removed.  Doe 1 did not understand what was happening.  She asked Castaneda-Prado what he was doing, and he said he was putting a blanket on her.  Doe 1 heard Castaneda-Prado's son in the shower down the hallway; Castaneda-Prado got up and left the living room when he heard his son come out of the shower.

On another evening, Doe 1 was lying on Castaneda-Prado's bed watching television with a blanket over her when Castaneda-Prado started rubbing her vagina on the outside.  Castaneda-Prado was lying next to Doe 1, and the bedroom door was closed.  Castaneda-Prado had told Doe 1 to go to his bedroom to watch television.  Doe 1 did not understand what Castaneda-Prado was doing, but she felt "scared" and "uncomfortable."  Doe 1 tried to get away, but Castaneda-Prado grabbed her ankle "really tight" and pulled her toward him.  Doe 1 "struggled to get off the bed."  She managed to get away and went into the bathroom.

On a different day, while Doe 1 and Doe 2 were staying at Castaneda-Prado's home, he told them to go watch television in his bedroom.  Doe 1 and Doe 2 went into the bedroom and sat on the bed with Castaneda-Prado.  The

3

girls sat on either side of Castaneda-Prado; the bedroom door was closed and locked. According to Doe 1, Castaneda-Prado told them they had to "massage" him if they wanted snack chips. Doe 2 stated she was "[v]ery sure" Castaneda-Prado did not threaten to withhold snack chips if she did not go to his bedroom and massage him.

Castaneda-Prado pulled down his pants zipper and told the girls to "'touch'" or "grab" his penis. Doe 2 refused to touch Castaneda-Prado's penis with her bare hands, and he told her to get gloves from the bathroom, which she did. Both girls testified they touched Castaneda-Prado's penis. Doe 1 testified Castaneda-Prado pulled her hand toward his penis.

Doe 1 got off the bed and went toward the door while Doe 2 remained under a blanket next to Castaneda-Prado. To Doe 1, Doe 2 looked "uncomfortable" and like she "wanted to leave." Castaneda-Prado touched Doe 2's thighs and vagina. Doe 2 was "confused" and "shocked"; she slid off the bed and onto the floor. The girls left the bedroom and returned to the living room.

Doe 1 eventually became scared to be alone with Castaneda-Prado because she believed he would hurt her. She started putting a small pillow between her legs when she lay down so she would know something had happened if it was removed. Doe 1's mother had given her an old cell phone, and Doe 1 "would always keep the [phone's] light on."

Doe 1 and Doe 2 did not disclose the sexual abuse to anyone at the time it occurred. They had agreed not to tell anyone, in part because their families were close with Castaneda-Prado and his family and they did not want to disrupt those relationships.

As Doe 1 got older, she felt depressed and ashamed about what had happened. She started cutting herself. She "cut" classes at school and

started smoking marijuana to avoid thinking about it. At some point she wanted to kill herself. Doe 1 began therapy sessions provided by her school. She disclosed the sexual abuse to her school counselor and her mother. Doe 1 was "scared for what was gonna happen next." Doe 1's mother telephoned Doe 2's mother. When Doe 2's mother asked Doe 2 if something had happened to her, Doe 2 disclosed her version of the sexual abuse.

Doe 1 and Doe 2 later participated in forensic interviews arranged by the police.

The police also arranged for Doe 1's mother to initiate a recorded pretext call with Castaneda-Prado. A recording of the call was played for the jury and admitted into evidence. According to a transcript of the call, Castaneda-Prado said "Well look, uh, I sincerely, I didn't, I didn't hurt your daughter (unintelligible). Do you understand me? Maybe one day I did do this. But, I didn't (unintelligible). . . . Perhaps I wasn't okay. I was drunk (unintelligible). But I didn't hurt her. I didn't do (unintelligible). . . . [¶] I regretted all of it because it was an accident." Castaneda-Prado also said "I didn't hurt your daughter in a big way," repeatedly apologized, and asked for forgiveness from Doe 1, her mother, and God.

An expert testified about Child Sexual Abuse Accommodation Syndrome. He testified that five "components" that appear frequently in child sexual abuse cases are (1) secrecy, (2) helplessness, (3) entrapment and accommodation, (4) delayed or conflicting disclosure, and (5) retraction or recanting.

### 2. The Defense Case

The defense presented several witnesses, including Castaneda-Prado's family members and friends, who testified he was not the type of person who would sexually molest children. Some of those witnesses also testified that

Doe 1 was or had been manipulative and was known to lie, and that Doe 2 was a follower and would get bossed around by Doe 1.

Castaneda-Prado's wife Maria Veronica Rodriguez Arroyo (who went by Vero) and their 25-year-old son Omar Castaneda and 27-year-old daughter Veronica Diaz Castaneda confirmed Veronica and Omar babysat Doe 1 and her younger brother during the weekdays when Doe 1 was in elementary school.[3] Omar and Veronica did not babysit Doe 2, but she would often visit, and Veronica or Castaneda-Prado's wife would look after her.

Castaneda-Prado's wife and children stated they never babysat Doe 1 and Doe 2 at the same time. On one occasion, Doe 1 yelled at Castaneda-Prado and called him names after Castaneda-Prado told her to stop yelling at her younger brother. Veronica and Omar testified they never saw Castaneda-Prado alone with Doe 1 or Doe 2.

Castaneda-Prado testified in his defense. He was 55 years old at the time of trial, had been married for almost 38 years, and had four children. He had worked as a landscaper. His wife worked with Doe 1's mother from 2010 to 2020, and their daughter Veronica looked after Doe 1, as did his son Omar occasionally. Castaneda-Prado knew Doe 2 since she was a baby; his wife would look after her. He stated Doe 1 and Doe 2 were never looked after in his home at the same time.

Castaneda-Prado denied touching Doe 1 or Doe 2 inappropriately or making them touch him, and he stated he did not allow children in his bedroom.

Castaneda-Prado discussed the incident when Doe 1 yelled at him for breaking up a fight between her and her brother. Doe 1 called him "stupid."

---

[3] Because Castaneda-Prado's adult children share a surname, we refer to them by their first names for clarity, intending no disrespect.

Castaneda-Prado yelled at Doe 1 and called her "rude." Castaneda-Prado felt bad for yelling at Doe 1 because he is "not the type of person that usually yells at children" or "mistreats" them. Castaneda-Prado testified that, when Doe 1's mother called him (the pretext call), he believed her allegations concerned the fighting incident between Doe 1 and her brother. Castaneda-Prado was apologizing for having scolded Doe 1. For instance, when Castaneda-Prado said, " 'I regretted all of it because it was an accident,' " he "was referring to what had happened" when he yelled at Doe 1 and not any sexual abuse.

## B. *Procedural Background: The Charges, Verdict, and Sentence*

An amended information charged Castaneda-Prado with five counts of committing a lewd or lascivious act upon a child under the age of 14 (Pen. Code,[4] § 288, subd. (a)).[5] As to each count, it was alleged Castaneda-Prado committed offenses against multiple victims (§ 667.61, subds. (j)(2), (e)(4)) and engaged in substantial sexual conduct (§ 1203.066, subd. (a)(8)).

The jury found Castaneda-Prado guilty on all counts and found true the allegations that the offenses involved multiple victims and substantial sexual conduct.

The trial court sentenced Castaneda-Prado to five consecutive prison terms of 25 years to life. Castaneda-Prado appealed.

---

[4] Undesignated statutory references are to the Penal Code.

[5] Based on the prosecutor's closing argument and the court's response to a question from jurors during deliberations, the parties on appeal agree that count 1 corresponds to the incident with Jane Doe 1 in the living room; count 2 involves the incident with only Jane Doe 1 in the bedroom; counts 3 and 4 relate to Jane Doe 1 and Jane Doe 2 touching Castaneda-Prado's penis in the bedroom; and count 5 involves his touching Jane Doe 2's vagina on that occasion.

7

## II. DISCUSSION

Doe 2 testified at the preliminary hearing that she had filed a declaration accusing Castaneda-Prado of sexually abusing her to assist her mother in obtaining a U visa. By the time of trial, Castaneda-Prado's counsel reported to the court that Doe 2 and her family were "pursuing immigration relief based on the allegations in this case." The trial court barred any cross-examination of Doe 2 on these topics. On appeal, Castaneda-Prado argues that this was error. We conclude the argument is well-taken.

### A. *Additional Background*

#### 1. The Preliminary Hearing

At the preliminary hearing in July 2020, toward the end of Doe 2's cross-examination, defense counsel questioned Doe 2 about the fact she and her mother had filed a request for a civil harassment restraining order against Castaneda-Prado in April of that year. Counsel asked Doe 2 whether there was "any other reason" for making that request, other than to "seek protection" from Castaneda-Prado, and Doe 2 said, "No." Counsel then asked about the declaration Doe 2 submitted with the request.

"[DEFENSE COUNSEL]: In this declaration, did you tell the Court that [Castaneda-Prado] had put his hands on your private area like you told the counselor [during the forensic interview]?

"[DOE 2]: Yeah.

"[DEFENSE COUNSEL]: And in this declaration you mentioned nothing about your touching his private area, is that correct?

"[DOE 2]: No, I was embarrassed.

"[DEFENSE COUNSEL]: Okay. You were born in the United States, correct?

"[DOE 2]: Yes.

8

"[DEFENSE COUNSEL]: And did you file this declaration to assist your mother in getting a U-visa?

"[DOE 2]: Yes.

"[DEFENSE COUNSEL]: You did?

"[DOE 2]: Yes."

On redirect examination, the prosecutor asked Doe 2 if she had fabricated the allegations against Castaneda-Prado to secure a U visa; Doe 2 stated she had not. Specifically, the following exchange occurred:

"[PROSECUTOR]: [Doe 2], thank you for opening up with us today and talking about some things that I know are embarrassing and difficult to talk about. It is important that we have all of the information and the truth. [¶] Everything that you are saying that [Castaneda-Prado] did, are you saying that [Castaneda-Prado] did that because he did do that or are you saying that he did that related to a U-visa?

"[DOE 2]: He did do that."

**2. Motions In Limine**

In October 2021, shortly before trial began, the parties filed motions in limine pertaining to U visas and immigration issues. In his trial brief, the prosecutor moved to "exclude any questioning of [Doe 2] or any other witnesses about any witnesses' current or former status as a citizen of the United States, or any other country, as well as exclude any questioning about U visas or immigration relief." The prosecutor described the exchange about U visas that had occurred at the preliminary hearing. The prosecutor cited *People v. Villa* (2020) 55 Cal.App.5th 1042 (*Villa*) (which we discuss further below) and stated that "[n]either Jane Doe 2, nor her mother, has in fact submitted a U visa application for certification."

The prosecutor elaborated: "At no point has Jane Doe 2 or her mother applied for certification of a U visa application, and at no point has Jane

9

Doe 2 or her mother indicated that any aspect of their participation in the criminal investigation and proceedings has anything to do with a U visa. To the contrary, given that Jane Doe 2 and her family reported the sexual abuse by [Castaneda-Prado] in 2019, a criminal case was filed in early 2020, the case proceeded through a live-witness prelim at which Jane Doe 2 testified in July of 2020, and now, more than a year later in October 2021 as this case is set to proceed to trial neither Jane Doe 2 nor her mother have submitted a U visa application for certification, a U visa appears to be at most a mere afterthought to Jane Doe 2 and her family. Accordingly, any questioning of witnesses about potential prospective pursuit of a U visa lacks sufficient relevance to be admitted at trial." Finally, the prosecutor argued concerns about undue consumption of time, confusion of the issues, and potential prejudice weighed against admission of evidence about immigration status and any immigration relief, including U visas.

For his part, defense counsel requested that the court order the prosecution "to provide to the defense any benefit, including . . . U-visa applications provided to any testifying witness, or their families, by the State, or any other organization as a result of this case." Counsel stated: "To date, the people have provided evidence that the mother of Jane Doe #2 has applied for a U-visa based on this case but the DA has not provided any documents or applications the witness created in furtherance of this. The defense believes that these documents should be provided. Additionally, the defense has reason to believe that Jane Doe #1's family have applied for a U-visa as well and the defense believes the Sonoma County District Attorney's office should provide information to the defense regarding this prior to any testimony by Jane Doe #1 or her family."

In a different motion in limine, defense counsel requested pursuant to Evidence Code section 352 "[t]hat no mention be made of [Castaneda-Prado's] immigration status" because "[his] national origin, and immigration status in the United States is not probative of any element of the charged [offenses] and is highly prejudicial."

### 3. The Hearing on the Motions In Limine

At the October 15, 2021 hearing on the motions in limine, Castaneda-Prado's counsel argued he "need[ed] to be able to inquire about U visa status in order to have a fair trial," because Jane Doe 2 had "admitted under oath" at the preliminary hearing that she filed her declaration to assist her mother in obtaining a U visa. Counsel also referred to a report by an investigator from the district attorney's office who had spoken with Jane Doe 2's mother. In the report (dated October 4, 2021), the investigator stated: "I asked [the witness] if she had applied for a U-visa. She told me, in summary, that she had inquired about how to get one and tried to make an appointment. Someone from Catholic Charities told her she needed to submit paperwork such as a police report and court documents first so at this point she is not sure if she'll be getting an appointment or not. She submitted those documents about 2 ½ weeks ago but hasn't heard anything back from them yet."

Defense counsel argued there were now "two confirmed reports by district attorney witnesses that Jane Doe 2 and her family are pursuing immigration relief based on the allegations in this case. I do not think this issue will be confusing to a jury. I think it's really a matter of asking a couple of questions of the witness." Counsel also said he intended to call an immigration attorney "who can succinctly describe what a U visa is and how one might be obtained," and provided a declaration from the immigration attorney.

11

Counsel argued the U visa evidence was relevant to Jane Doe 2's credibility under Evidence Code section 780, subdivision (f) and showed "bias, interest, other motives while testifying, motive to fabricate."[6] Finally, counsel stated that, "as the Court is aware, there's lots of other issues of character and credibility of both Jane Doe No. 1 and Jane Doe No. 2, with multiple witnesses saying that Jane Doe No. 1 is dishonest and had the ability to manipulate Jane Doe No. 2. [¶] So I think this issue and the character-evidence issue are intertwined with the U visa issue . . . ."

The prosecutor responded that "none of the people involved in this case have filed a petition for an application for a U visa or any other immigration relief that the People are aware of." Instead, the family might have been having informal discussions with Catholic Charities about a U visa. The prosecutor also argued (as he had in his written motion) that the evidence should be excluded under Evidence Code section 352, i.e., the probative value was substantially outweighed by the probability its admission would necessitate undue consumption of time or confuse or mislead the jury.

Defense counsel then argued that, because it was not clear "what documents were submitted to whom and for what," the court should hold a hearing under Evidence Code section 402 to "get a little bit more information here." Counsel also stated that what was important was the intent to seek a U visa, which had been "demonstrated over the life of this case."

_____

[6] Evidence Code section 780 provides in part: "Except as otherwise provided by statute, the court or jury may consider in determining the credibility of a witness any matter that has any tendency in reason to prove or disprove the truthfulness of his testimony at the hearing, including but not limited to any of the following: [¶] . . . [¶] (f) The existence or nonexistence of a bias, interest, or other motive. [¶] . . . ."

The trial court granted the prosecution's motion to exclude evidence about U visas. Citing *Villa*, the court concluded the probative value of the evidence was substantially outweighed by its prejudicial nature and the dangers of wasting time, confusing the issues, and distracting the jury. First, stating that it understood the argument that the evidence was relevant, the court noted the present case was several years old but the subject of U visas was only recently discussed with Catholic Charities. The court noted the issue did come up earlier, at the preliminary hearing, where, the court stated, Jane Doe 2 "answered apparently incorrectly."

As to prejudice and related concerns, the court stated: "But first I do think I'm agreeing with many things that [the prosecutor] said at this point as far as the *Villa* case, that all the factors about time, undue consumption of time, substantial risk of distracting and confusing the jury, kind of all the reasons you don't want—you don't want anyone knowing it. [¶] And I'm not sure who is in the state legally or the country legally and who is not. It's one of the reasons that . . . I believe that [defense counsel's] in limine mentioned the defendant's immigration status not being discussed. It's prejudicial, distracting, confusing to the jury, potential to prejudice the jury against the victim, in your case against the defendant—and all those factors in *Villa*, I think, apply here."

Defense counsel again asked the court to hold an Evidence Code section 402 hearing, arguing that testimony from Jane Doe 2's mother "would clear a lot of this up" and that the key issue was whether there was an intent to apply for a U visa. The prosecutor opposed the request, arguing that an expression of intent to seek a U visa in the future should not change the court's analysis as to the admissibility of the evidence under Evidence Code section 352. The prosecutor stated: "If the Court agrees and would maintain

13

its ruling even if somebody in this case expressed a potential intent or even a definite intent to apply for immigration relief through the U visa process at some point in the future, then there's no need for a 402; and the People believe that would be an appropriate order." The court declined to hold an Evidence Code section 402 hearing, stating its "analysis would be the same."

Later in the same hearing, when addressing the defense motion for an order requiring the prosecution to provide information about U visa applications, the court stated it was granting that motion and directing the prosecutor to turn over any available information "for any further argument." The prosecutor stated the People agreed with the court's order and explained "the measures that the People [had] engaged in with this issue" to ascertain if there was anything "determinative."

The prosecutor stated his understanding of the U visa process is that an application can be submitted either to the investigating agency (the Santa Rosa Police Department) or the district attorney's office. The prosecutor stated the People had inquired at the police department a few weeks earlier and learned that no applications had been submitted for Jane Doe 1, Jane Doe 2, or either of their mothers. An inquiry at the district attorney's office yielded the same result. Because of Jane Doe 2's statements at the preliminary hearing, the People had spoken with Jane Doe 2's mother to double-check, but "there was nothing to indicate that she has submitted an application for a U visa."

In response, defense counsel suggested the prosecutor should look into whether either of the families had sought information about a U visa from the victim advocates in his office. The court stated it was "not ordering [the prosecution] to do anything," but asked the prosecutor if he had "[a]ny information." The prosecutor stated: "[The] People will just state we're not

14

conceding that—the extent of a relationship the defense has essentially speculated to in the existence of this case. [¶] The People would just note that, with respect to the actual application, the People believe we've looked into this and there's no reason at this time to believe that it's been submitted. I think any discussions are a separate issue."

### 4. Midtrial Requests for Reconsideration of the Court's In Limine Ruling

#### a. *Before Doe 1's Testimony*

Prior to Doe 1's testimony, defense counsel asked outside the presence of the jury that the court reconsider its order excluding any references to U visas. Counsel stated: "I made a fairly long record about [the U visa issue] in in limines, but I do think it is undisputed that it is relevant and I think credibility of witnesses is a very big issue in this case. And I know the Court made a ruling under [Evidence Code section] 352 earlier excluding any questioning on that topic, but I would like the Court to reconsider that. I want to put that on the record that I'm making that request again." The court declined counsel's request, stating its previous ruling would stand.

#### b. *During Doe 2's Cross-Examination*

During Doe 2's cross-examination, and outside the presence of the jury, defense counsel stated he intended to ask Doe 2 whether she or her family were receiving any benefit from her testimony, an area counsel argued was relevant to show bias and motive to fabricate. The prosecutor opposed the request, stating counsel's question was "problematic" in light of the court's prior ruling precluding questioning about the U visa issue. Defense counsel argued "this is critical to my defense to give the jury some understanding of why a minor may fabricate something." Counsel acknowledged the question might open the door to questioning about the U visa.

15

Because defense counsel did not articulate (in response to a question from the court) any specific basis for the question other than the U visa issue, the court denied counsel's request, reasoning the proposed question was "intended to go down the road of the U-Visa." The court stated: "I've heard your argument. I've ruled on it. I appreciate you coming back here more than you know at this point and bringing it up to us. My ruling is going to stand. The objection will be noted for the record. If there is any other basis that you have, information why to ask that question about a good faith belief for something else, and anything given this witness I would absolutely 100 percent believe it is admissible. But I'm not hearing that at this point. I'm not going to allow the question."

  c. *During the Prosecutor's Closing Argument*

During closing argument, the prosecutor stated: "Just in terms of recollection, if this was a case of false accusations, would you expect an answer to every question? Jane Doe-1 and Jane Doe-2 didn't try to do that. They couldn't do that. They were candid about what they remembered and candid about what they didn't. And in considering the credibility of Jane Doe-1 and Jane Doe-2, there is a lack of an identifiable reason to lie." Defense counsel objected, and the court overruled the objection.

The prosecutor continued: "When you think about false accusations in a case like this, you think what does a person have to gain. Is it money? Is this person going after somebody's money? There has been no evidence presented in this case to suggest anything like that. Is it custody perhaps? Is it somebody who needs to maybe use the accusation as a tool to get away from somebody? Nothing." Defense counsel objected to the prosecutor's "line of argument given prior discussions"; the court overruled the objection.

The prosecutor then stated: "Frankly, aside from psychological well-being, from the loss of family, from the loss of friends, loss that these girls

knew they and their mothers would experience. There was a lot more to lose than to gain in some regards."

Immediately after the prosecutor's closing argument, and outside the presence of the jury, defense counsel asked to make a further record about the U visa issue. The court stated that it had made its ruling and understood counsel's position, which had "been on the record a thousand times already."

After a recess, defense counsel reiterated (and the court granted) his request to make a record about the U visa issue and the prosecutor's closing argument. Counsel stated: "There was a portion where [the prosecutor] had a slide on the computer screen from a Power Point presentation that was essentially about credibility of witnesses. One of the points on the slide said that there was no incentive for Jane Does to lie in this case. I know I brought this up several times, but it is my belief based on a statement Jane Doe-2 made under oath at the preliminary hearing that she and her family were seeking a U-Visa, also based on a statement turned over to me from the District Attorney's office that to me indicated that Jane Doe-2 and her family were seeking a U-Visa based on this case. I know that's in the Court file. I submitted that during motions in limine. I thought that was an improper argument given that there is a potential benefit and reason to lie that's been suppressed. That's why I objected. I wanted to make that clear for the record."

The prosecutor countered that the argument was proper, stating the slide made "a reference to identifiable reason to lie. Specifically an argument based on the body of evidence that's been presented in this case, which is the body of evidence from which this jury needs to base its decision. With respect to whether or not that evidence—the state of the evidence the People believe that was already address[ed]. But to be clear about what came up. It was a

comment from the body of evidence for which the jury must base their decision."

The court noted defense counsel's objection and stated it "was overruled with the previous basis [having been] stated."

**B. *Analysis***

Castaneda-Prado argues the trial court violated his confrontation and due process rights by excluding all evidence related to a U visa. Before turning to our analysis, we begin with the governing legal standards.

**1. Legal Standards**

*a. Sixth Amendment Protection of Cross-Examination*

Cross-examination is known as " 'the greatest legal engine ever invented for the discovery of truth.' " (*White v. Illinois* (1992) 502 U.S. 346, 356.) "Subject always to the broad discretion of a trial judge to preclude repetitive and unduly harassing interrogation," the United States Supreme Court has said, "[c]ross-examination is the principal means by which the believability of a witness and the truth of his testimony are tested." (*Davis v. Alaska* (1974) 415 U.S. 308, 316 (*Davis*).)

In criminal cases, the right to cross-examine is not only fundamental to the adversarial process; it is constitutionally protected. The Sixth Amendment to the United States Constitution, applicable to the states through the due process clause of the Fourteenth Amendment (*Pointer v. Texas* (1965) 380 U.S. 400, 403), "guarantees the right of an accused in a criminal prosecution 'to be confronted with the witnesses against him.' " (*Davis, supra,* 415 U.S. at p. 315.)[7] As Professor Wigmore once said, " 'The

---

[7] Article I, section 15 of our state constitution supplies the same guarantee, providing a criminal defendant with "the right . . . to be confronted with the witnesses against" him. (See *People v. Cromer* (2001)

18

opponent demands confrontation, not for the idle purpose of gazing upon the witness, or of being gazed upon by him, but for the purpose of cross-examination, which cannot be had except by the direct and personal putting of questions and obtaining immediate answers.' " (*Davis*, *supra*, 415 U.S. at p. 316, quoting 5 Wigmore on Evidence (3d ed. 1940) § 1395, p. 123.)

The high court's "Confrontation Clause cases fall into two broad categories: cases involving the admission of out-of-court statements and cases involving restrictions imposed by law or by the trial court on the scope of cross-examination." (*Delaware v. Fensterer* (1985) 474 U.S. 15, 18.) In the latter class of cases, restrictions so stringent as to render cross-examination ineffective will give rise to confrontation clause questions because, in that scenario, they " 'effectively . . . emasculate the right of cross-examination itself.' " (*Id.* at p. 19.)

Cross-examination for bias, in particular, has a special place in confrontation clause jurisprudence. Courts have long " 'recognized that the exposure of a witness' motivation in testifying is a proper and important function of the constitutionally protected right of cross-examination.' " (*Van*

---

24 Cal.4th 889, 896.) "The California constitutional provision was added in 1974 in order to restate what had already been in existence in the due process clause of the state Constitution. The California Constitutional Revision Commission treated the new clause as being identical with the right afforded by the U.S. Constitution." (*In re Damon H.* (1985) 165 Cal.App.3d 471, 477, fn. 6.) Although our state charter is " ' "a document of independent force" ' [citation] that sets forth rights that are in no way 'dependent on those guaranteed by the United States Constitution' " (*People v. Buza* (2018) 4 Cal.5th 658, 684; see Cal. Const., art. I, § 24), we see "no reason to think" California's confrontation clause "would be interpreted differently than the United States Supreme Court has interpreted the United States constitutional right of confrontation." (*People v. Bertoldo* (1978) 77 Cal.App.3d 627, 632.)

*Arsdall*, *supra*, 475 U.S. at pp. 678–679; see *United States v. Abel* (1984) 469 U.S. 45, 52.) That is because, among the many varieties of impeachment evidence, bias has traditionally been viewed as especially powerful. (*Alford v. United States* (1931) 282 U.S. 687, 693.) The cases in this area tend to treat cross-examination on motive to fabricate more favorably than other forms of impeachment. (*United States v. Abel*, *supra*, 469 U.S. at p. 52 ["Proof of bias is almost always relevant because the jury, as finder of fact and weigher of credibility, has historically been entitled to assess all evidence which might bear on the accuracy and truth of a witness' testimony."].)

This is consistent with how proof of bias has traditionally been handled in the law of evidence generally. As the high court explained in *Abel*, "The 'common law of evidence' allowed the showing of bias by extrinsic evidence, while requiring the cross-examiner to 'take the answer of the witness' with respect to less favored forms of impeachment." (*United States v. Abel*, *supra*, 469 U.S. at p. 52.) So it is under the confrontation clause, where facts showing bias are considered so highly probative of credibility they are almost never deemed categorically off-limits. (*Id.* at p. 52, citing Hale, *Bias as Affecting Credibility* (1949) 1 Hastings L.J. 1.) Where a proper foundation is laid for the inquiry, "the trial judge may not deny a reasonable opportunity . . . to prove the witness's bias" through cross-examination or through other witnesses, but "she has a discretion to control the extent of the proof." (1 McCormick on Evidence (8th ed. 2022) Bias and partiality, § 39.)

b. Delaware v. Van Arsdall

*Davis v. Alaska, supra,* 415 U.S. 308, and *Delaware v. Van Arsdall*, *supra*, 475 U.S. 673, are the leading United States Supreme Court cases on the constitutional protection of cross-examination for bias. Both cases are relevant here, but because the holding in *Van Arsdall* is central to our analysis, it deserves fulsome consideration to set the stage for the discussion

to come. There, defendant Van Arsdall and his friend Pregent were the only two people in Pregent's apartment with Epps, the victim, when she was stabbed to death. (*Van Arsdall, supra*, 475 U.S. at p. 674.) The evidence of who committed the killing, Pregent or Van Arsdall, was circumstantial. (*Ibid*.) Fleetwood, who lived in the apartment across the hall, testified that on the evening of the homicide, he walked over, looked into Pregent's living room from the open doorway, and saw Van Arsdall sitting on the edge of the sofa bed next to Pregent's feet. (*Id*. at p. 675.)

At Van Arsdall's trial for the murder of Epps, the trial court refused to allow the defense to cross-examine Fleetwood about his having agreed to speak to investigators only on condition that a pending driving under the influence (DUI) charge against him be dismissed. (*Van Arsdall, supra*, 475 U.S. at p. 676.) Fleetwood was drunk on the evening of the homicide (*id*. at p. 677), and in closing argument the defense was able to attack the accuracy and reliability of his recall for that reason (*ibid*.), but due to the trial court's ruling on dismissal of the DUI charge, the defense was totally foreclosed from attempting to show that he had a motive to fabricate. On appeal, the Delaware Supreme Court held that " 'a blanket prohibition against exploring potential bias through cross-examination' " violates the confrontation clause and is " 'per se error' " requiring automatic reversal without any inquiry into prejudice. (*Id*. at pp. 677–678.) The United States Supreme Court reversed on the prejudice point (*id*. at pp. 680–684), but largely embraced the Delaware Supreme Court's finding of a Sixth Amendment violation (*id*. at pp. 678–680).

The high court's holding was twofold. First, reiterating the caveat laid down in *Davis* for traditionally recognized trial court discretion to control the scope of cross-examination (*Davis, supra*, 415 U.S. at p. 316), the court

21

explained that trial courts "retain wide latitude . . . to impose reasonable limits on such cross-examination based on concerns about, among other things, harassment, prejudice, confusion of the issues, the witness' safety, or interrogation that is repetitive or only marginally relevant." (*Van Arsdall, supra*, 475 U.S. at p. 679.) But defendant Van Arsdall was flatly prohibited "from engaging in otherwise appropriate cross-examination designed to show a prototypical form of bias on the part of the witness." (*Id.* at p. 680.) And under those circumstances, the court held, a confrontation clause violation was shown because "[a] reasonable jury might have received a significantly different impression" of Fleetwood's credibility if the proposed line of cross-examination had been permitted. (*Ibid.*)

Second, the court held that "the constitutionally improper denial of a defendant's opportunity to impeach a witness for bias, like other Confrontation Clause errors, is subject to *Chapman* harmless-error analysis." (*Van Arsdall, supra*, 475 U.S. at p. 684; *id.* at p. 680, citing *Chapman, supra*, 386 U.S. at p. 24.) "The correct inquiry," the court explained, "is whether, assuming that the damaging potential of the cross-examination were fully realized, a reviewing court might nonetheless say that the error was harmless beyond a reasonable doubt." (*Van Arsdall, supra*, 475 U.S. at p. 684.) Whether a particular confrontation clause violation is harmless, the court said, "depends upon a host of factors," including "the importance of the witness' testimony in the prosecution's case, whether the testimony was cumulative, the presence or absence of evidence corroborating or contradicting the testimony of the witness on material points, the extent of cross-examination otherwise permitted, and . . . the overall strength of the prosecution's case." (*Ibid.*)

Proper application of *Van Arsdall* requires threshold consideration of whether the trial court exercised sound discretion under state law evidentiary standards in limiting the scope of cross-examination. The high court's acknowledgment that trial courts "retain wide latitude . . . to impose reasonable limits on such cross-examination" (*Van Arsdall*, *supra*, 475 U.S. at p. 679) leaves room for an evaluation of admissibility under the Evidence Code, tested under the deferential abuse of discretion standard of review governing such discretionary questions (*People v. Waidla* (2000) 22 Cal.4th 690, 713–714).[8] If the trial court excluded "evidence of marginal impeachment value" (*People v. Brown* (2003) 31 Cal.4th 518, 545) or otherwise merely carried out the routine evidentiary function of controlling the scope of permissible cross-examination, the answer to this initial evidence question will generally be yes—the trial court was within its discretion—and the inquiry comes to an end. There was no error, under either state law or under the Sixth Amendment.

We say "generally" because the Sixth Amendment circumscribes the trial court's discretion. (See *People v. Linton* (2013) 56 Cal.4th 1146, 1188 [" 'Within the confines of the confrontation clause, the trial court retains wide

---

[8] See, e.g.*, People v. Mendez* (2019) 7 Cal.5th 680, 704, 705 (cross-examination question about exhibit showing witness's gang membership "would have risked wasting time and creating confusion[,] . . . all without much benefit," and "was permissibly barred under Evidence Code section 352"); *People v. Pearson* (2013) 56 Cal.4th 393, 455-456 (proposed cross-examination questions lacked foundation and were speculative); see also, e.g., *People v. Virgil* (2011) 51 Cal.4th 1210, 1252 (proposed cross-examination questions lacked foundation, were cumulative, and were argumentative); *People v. Sully* (1991) 53 Cal.3d 1195, 1220, 1221 (impeachment value of proposed cross-examination questions was "marginal," "peripheral to the issue in the case," without foundation, and potentially prejudicial).

latitude in restricting cross-examination that is repetitive, prejudicial, confusing of the issues, or of marginal relevance.' "].) Where a trial court effectively renders cross-examination an exercise in futility, we must proceed to a second stage of analysis. Here, we ask a further, purely constitutional question whether "[a] reasonable jury might have received a significantly different impression" of the challenged witness's credibility if the proposed line of cross-examination had been permitted. (*Van Arsdall*, *supra*, 475 U.S. at p. 680.) At this stage of the analysis, courts conduct what is akin to a mini-prejudice inquiry focused on the witness's cross-examination rather than the outcome of the trial as a whole, examining whether the defense had other means of impeachment,[9] and always bearing in mind that " 'the Confrontation Clause guarantees an *opportunity* for effective cross-

---

[9] See, e.g., *People v. Gonzalez* (2021) 12 Cal.5th 367, 406–407 ("[T]he record makes clear defense counsel was allowed to ask Rowan and Celina questions that were intended to examine whether the answers they provided on direct examination were tainted by their desire to secure a lesser sentence. While the trial court prohibited the defense from asking differently phrased questions that were meant to examine that same issue, we fail to see how those questions would have produced 'a significantly different impression' [citation] of the witnesses' credibility."); *People v. Quartermain* (1997) 16 Cal.4th 600, 624 ("Younge admitted on cross-examination that he had previously perjured himself 'many times' while testifying in other judicial proceedings, that he had bribed others to commit perjury, and that he had coached yet another witness in a different proceeding to give perjured testimony. Younge also admitted that he had been convicted of 'a hundred and thirty something' counts of mail fraud as well as sale of cocaine and conspiracy to manufacture and distribute methamphetamine. . . . Because of the impeachment evidence that was presented, a reasonable jury would not have received a significantly different impression of Younge's credibility had he additionally been cross-examined regarding his bribery of two judges in other proceedings."); see also, e.g., *People v. Williams* (1997) 16 Cal.4th 153, 207–208; *People v. Chatman* (2006) 38 Cal.4th 344, 374.

24

examination, not cross-examination that is effective in whatever way, and to whatever extent, the defense might wish.' " (*Van Arsdall*, *supra*, 475 U.S. at p. 679, emphasis in original.)

While our Supreme Court has not squarely addressed the standard of review applicable to this core aspect of the *Van Arsdall* analysis, the court generally speaks of abuse of discretion when addressing claims of *Van Arsdall* error. (See, e.g., *People v. Mendez*, *supra*, 7 Cal.5th at p. 703; *People v. Pearson*, *supra*, 56 Cal.4th at pp. 455-456; *People v. Peoples* (2016) 62 Cal.4th 718, 765; *People v. Belmontes* (1988) 45 Cal.3d 744, 781.) But "[t]he abuse of discretion standard is not a unified standard" of review (*Haraguchi v. Superior Court* (2008) 43 Cal.4th 706, 711) and "the deference it calls for varies according to the aspect of a trial court's ruling under review." (*Ibid.*) By analogy to other areas of confrontation clause jurisprudence, we will undertake de novo review of whether a reasonable jury might have received a significantly different impression of Doe 2's credibility had the proposed line of cross-examination been permitted.[10]

Where courts reach the second stage of the *Van Arsdall* analysis and find error, reversal is required unless the government can show the error was harmless beyond a reasonable doubt under *Chapman*. This two-step analysis under *Van Arsdall*, with an initial question under state evidence law, and a

---

[10] See *People v. Garcia* (2020) 46 Cal.App.5th 123, 168–169 ("We apply de novo review to [a] claim that [the defendant's] rights under the confrontation clause were violated [under *Crawford v. Washington* (2004) 541 U.S. 36]. [Fn. omitted.] [Citation.] [But w]hen reviewing whether substantial evidence supports the gang enhancement, 'We review the entire record in search of reasonable and credible evidence of solid value, viewing all the evidence in the light most favorable to the prosecution, and drawing all reasonable inferences in favor of the jury's findings.' "); see also *People v. Seijas* (2005) 36 Cal.4th 291, 304.

second, sometimes overlapping constitutional question present in the background under the Sixth Amendment, is similar to the established mode of analysis utilized in "cases involving the admission of out-of-court statements." (*Delaware v. Fensterer*, *supra*, 474 U.S. at p. 18; see *Crawford v. Washington*, *supra*, 541 U.S. 36; *People v. Sanchez* (2016) 63 Cal.4th 665, 674.) As we shall explain below, after proceeding through the entire *Van Arsdall* framework, we conclude that, on this record, there was a confrontation clause violation under *Van Arsdall*, and that *Chapman* requires reversal.

### 2. Evidence Code Section 352

All relevant evidence is admissible unless otherwise provided by statute. (Evid. Code, § 351.) "Relevant evidence" is defined as evidence that has any reasonable tendency to prove or disprove any disputed fact that is of consequence to the determination of the action. (Evid. Code, § 210.) The outer bounds of relevance, always within the trial court's discretion to set, are subject to the court's authority to exclude proffered evidence "if its probative value is substantially outweighed by the probability that its admission will (a) necessitate undue consumption of time or (b) create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury." (Evid. Code, § 352.) Although the trial court need not expressly set forth its weighing process on the record, since its reasoning can often be inferred, the " 'better practice' " is for it do so. (*People v. Carter* (2005) 36 Cal.4th 1114, 1151.)

Giving reasons, the trial court struck the Evidence Code section 352 balance here in favor of excluding any evidence relating to expected benefits from the U visa program. Its rationale was twofold, initially articulated in support of its in limine ruling prior to trial and then maintained when defense counsel returned to the issue during trial. First, adopting the

26

prosecution's principal argument for exclusion, the court found significant the fact that there was no evidence any U visa application had been submitted.  Second, the court pointed out that, in addition to undue consumption of time and a substantial risk of distracting and confusing the jury, introducing the topic of anyone's undocumented immigration status could prejudice the minds of the jury, not only against Doe 2 but potentially against Castaneda-Prado himself.

"The discretion granted the trial court by section 352 is not absolute." (*Brainard v. Cotner* (1976) 59 Cal.App.3d 790, 796.)  It is a " 'legal discretion,' " always cabined by the legal premises on which it rests (*Sargon Enterprises, Inc. v. University of Southern California* (2012) 55 Cal.4th 747, 773), and it must always be "exercised reasonably in accord with the facts before the court."  (*Brainard v. Cotner*, *supra*, 59 Cal.App.3d at p. 796.) "Reasonable exercise of trial court discretion pursuant to Evidence Code section 352 requires" "consideration of the relationship between the evidence and the relevant inferences to be drawn from it, whether the evidence is relevant to the main or only a collateral issue, and the necessity of the evidence to the proponent's case as well as the reasons recited in section 352 for exclusion."  (*Kessler v. Gray* (1978) 77 Cal.App.3d 284, 291.)

The Evidence Code speaks in terms of avoiding "*undue*" consumption of time on collateral matters (Evid. Code, § 352, italics added) and "*undue*" prejudice or jury distraction (*ibid.*, italics added).  " 'Unless the dangers of undue prejudice, confusion, or time consumption " '*substantially* outweigh' " the probative value of relevant evidence, a section 352 objection should fail.' " (*People v. Doolin* (2009) 45 Cal.4th 390, 439, italics added.)  Thus, Evidence Code section 352 balancing is undertaken on a sliding scale.  "The more substantial the probative value of the evidence, the greater the danger of the

presence of one of the excluding factors that must be present to support an exercise of trial court discretion excluding the evidence. [Citation.] [¶] Where the evidence relates to a critical issue, directly supports an inference relevant to that issue, and other evidence does not as directly support the same inference, the testimony must be received over a section 352 objection absent highly unusual circumstances." (*Kessler v. Gray*, *supra*, 77 Cal.App.3d at pp. 291–292.)

Because we are dealing with bias evidence, Evidence Code section 352 balancing must begin here with a sharp tilt on the sliding scale in favor of admissibility. It has long been recognized that a criminal defendant may " 'explore whether a witness has been offered any inducements or expects any benefits for his or her testimony, as such evidence is suggestive of bias.' " (*People v. Pearson*, *supra*, 56 Cal.4th at p. 455; *People v. Duran* (1976) 16 Cal.3d 282, 294; Evid. Code, § 780, subd. (f).) As a Second District, Division Three panel explained 45 years ago—consistent with the high court's later recognition in *Van Arsdall* of the weight traditionally given to proof of bias in evidence law generally—"A party can offer evidence, by proffered extrinsic evidence or by cross-examination of a witness, to attack the credibility of a witness, if such evidence tends reasonably to establish that the witness has a motive to fabricate, or some other motive, that tends to cause the giving of untruthful testimony, even though there may be no reasonable basis for the existence of such a motive." (*People v. Allen* (1978) 77 Cal.App.3d 924, 931.)[11]

---

[11] See Simons, California Evidence Manual (2022) Attacking or supporting credibility—Bias, interest, or other motive, section 3:43 ("A witness may be questioned about promises, expectations, or any hope of benefits from the other party, however unreasonable").

It is also important to bear in mind that the bias evidence we have here was proffered on a highly consequential issue for Castaneda-Prado. Sometimes, "Impeachment of a witness can make the difference between acquittal and conviction, especially where credibility is the major issue in a case and evidence at trial will consist of opposing stories presented by the defense and the prosecution witnesses." (*Abatti v. Superior Court* (2003) 112 Cal.App.4th 39, 52.) The trial court acknowledged the relevance of the proffered U visa evidence to Castaneda-Prado's defense, and at no point suggested that it was peripheral to the case or that it added little to the impeachment material Castaneda-Prado already had at his disposal. While there is certainly room for debate about whether the probative value of the U visa evidence was so potent that it could have led to acquittal on all charges, the court implicitly recognized the evidence deserved to be given substantial probative weight. And correctly so. The jury's guilty verdicts turned almost entirely on the credibility of Does 1 and 2. There was no physical evidence of the alleged sexual offenses, and investigators in this case had no ability to seek to obtain physical corroboration of the "historical disclosure[s]" by the two victims.

During the argument on the motion in limine, there was much discussion of whether anyone in Doe 2's family had actually applied for a U visa. In the absence of any proof of an application for U visa benefits, the court apparently believed a "preliminary fact" requisite to admissibility had not been established. (Evid. Code, § 403, subd. (a); see *People v. Lucas* (1995) 12 Cal.4th 415, 466.) The Attorney General takes the same position in his responding brief here on appeal, contending "there was no basis for defense counsel to pursue the theory that Doe 2 altered her testimony in the hopes of obtaining a U visa for her mother" and that it was speculative to do so. But

29

the idea that a foundation was lacking for Castaneda-Prado's proposed cross-examination of Doe 2 is misplaced. Although a U visa application would certainly have justified an inference that Doe 2 believed testifying favorably to the prosecution would benefit her mother (so long as she knew of the application and had some understanding of what it meant), that was not the only way her intent could be proved. Here, she *admitted* trying to help her mother obtain a U visa at the preliminary hearing. Nothing else was necessary to provide a good faith basis to cross-examine on the issue at trial. The only remaining question had to do with the scope of cross-examination, not whether it could be undertaken at all.

In defense of the trial court's Evidence Code section 352 ruling, the Attorney General relies heavily on the recent opinion in *Villa, supra,* 55 Cal.App.5th 1042, just as the prosecutor did in the trial court. But we see this case in all material respects as the polar opposite of *Villa. Villa* involved a prosecution for various offenses arising out of a domestic violence incident in which defendant Villa was accused of beating his girlfriend, Jane Doe, while they were both riding in Villa's truck. (*Id.* at pp. 1044–1047.) Villa, who was at the wheel, struck Jane Doe repeatedly and ordered her to get out of the vehicle even though they were on the freeway. (*Id.* at p. 1045.) He also tried to intimidate her into not reporting his abuse. (*Id.* at p. 1046.) There was medical evidence of the wounds Doe suffered and evidence of defendant Villa's intoxication (*ibid*); the officer who pulled over the truck saw that she had visible wounds (*ibid.*); and Doe had suffered a previous beating at the hands of defendant Villa only weeks before (*ibid.*). Doe testified at a preliminary hearing before submitting a U visa application—at an Evidence Code section 402 hearing she stated she was unaware of what a U visa was when she gave her preliminary hearing testimony—and she then testified to

30

similar facts at trial, after learning about and submitting a U visa application. (*Villa*, at pp. 1048, 1052–1053.)

The *Villa* trial court excluded any evidence of the U visa application at trial, and an appellate panel affirmed, concluding that (1) the evidence "didn't provide much of a basis to question [Doe's] testimony" in light of the extensive corroborating evidence in the case and the consistency in her accounts, which made its probative value limited (*Villa, supra,* 5 Cal.App.5th at pp. 1052–1053), (2) the evidence "would have been unduly time consuming to present" because of the need to explore exactly what Doe knew about the U visa program and when she knew it (*id.* at p. 1053), (3) to evaluate whether the U visa program gave Doe "a strong reason to lie," there was a substantial risk the jury might have been distracted with collateral issues concerning the likelihood Doe would receive permanent residency status (*ibid.*), and (4) there was "at least some potential" for prejudice to Doe, since one or more jurors "might be inclined to view her unfavorably if they found out she could use her standing as a victim of abuse to gain a path to legal immigration status" (*ibid.*).[12]

*Villa* differs from this case in at least three notable respects. First, because the prosecution's case against Castaneda-Prado turned almost entirely on credibility, the Evidence Code section 352 analysis here, as noted above, starts with the fact we are dealing with evidence of weighty probative

---

[12] The court stated that "[t]his concern is precisely the reason Evidence Code section 351.4 limits evidence of a person's immigration status in criminal trials." (*Villa, supra,* 55 Cal.App.5th at p. 1054; see Evid. Code, § 351.4, subd. (a) ["In a criminal action, evidence of a person's immigration status shall not be disclosed in open court by a party or their attorney unless the judge presiding over the matter first determines that the evidence is admissible in an in camera hearing requested by the party seeking disclosure of the person's immigration status."].)

value on a critical issue. *Villa*, by contrast, is a case where the proffered impeachment for bias had only slight probative value because there was extensive corroboration for Doe's testimony, both documented and from other witnesses. Second, the *Villa* court recognized that, if U visa evidence had been admitted in that case, there would have been an inevitable contest over whether, in Doe's mind, the U visa process could possibly have influenced her testimony and to what extent. That is evident because Doe testified to knowing nothing about the U visa program when she first stepped forward to testify at the preliminary hearing. In this case, by contrast, Doe 2 admitted she knew of and was motivated by potential U visa benefits when she first gave a sworn statement accusing Castaneda-Prado of abuse in April 2020. And third, Doe's testimony in *Villa* remained consistent from the beginning, while in this case, after initially reporting the alleged offense to her mother—the potential beneficiary of the U visa program—Doe 2's testimony grew more detailed and more incriminating to Castaneda-Prado over time.[13]

In light of Doe 2's preliminary hearing testimony, why the court expressed concern about undue consumption of time and jury distraction is puzzling. It is not at all clear that *any* inquiry into U visa practice and procedure, with attendant complexities requiring expert explanation, or *any* probing of Doe 2's understanding of the likelihood her mother would actually obtain immigration relief, was required here. What mattered most was that Doe 2 apparently believed she was furthering her mother's interest in

---

[13] We do not suggest that Doe 2's testimony was not believable because of these changes. For any witness, recounting the same facts multiple times at a distance of years will often result in such variations, and in any event differences in Doe 2's recall at different times were only a factor for the jury to consider in weighing her testimony. (See CALCRIM No. 226 [jury to "consider anything that reasonably tends to prove or disprove the truth or accuracy of that testimony"].)

obtaining a U visa by giving damaging testimony about Castaneda-Prado. Defense counsel was entitled to probe that belief on cross-examination, no matter how unreasonable or untutored it may have been.[14]  Legally, this point was not subject to reasonable debate; overlooking it was an error of law. Factually, the trial court brushed off Doe 2's preliminary hearing testimony with the comment that the testimony was "apparently incorrect[]."  But that was a credibility issue for the jury to assess.  For the court to decide the issue in an exercise of Evidence Code section 352 discretion was an improper invasion of the jury's role.  The fact that the court did so without an Evidence Code section 402 hearing makes things even more problematic.  Rather than hold such a hearing, the court said it was unnecessary to take that step because, no matter what facts were presented, it would adhere to its earlier announced view that any inquiry into U visa matters was inadmissible and off-limits.  Developing the record further was pointless, the court concluded, because admission of U visa related evidence at trial would inevitably cause problems of time consumption and distraction of the jury.

The difficulty with this categorical approach to the admissibility analysis is that, based on Doe 2's preliminary hearing testimony alone—without more—Castaneda-Prado had *already* established a foundation for cross-examination questions on the topic of expected U visa benefits.  Rather than flesh out the record in order to provide suitable Evidence Code section 352 guardrails for the scope of cross-examination—and for any other

---

[14] See *People v. Cornwell* (2005) 37 Cal.4th 50, 93–94 (defense counsel should be able to cross-examine a prosecution witness, who had received immunity for his role in the crime, as to the sentence the witness *believed* he was facing, even if that belief was inaccurate; there was no need to explore the "basis" for that belief); Simons, California Evidence Manual, *supra*, section 3:43.

testimony Castaneda-Prado or the People might have wished to present on the matter—the court, like the trial court in *Van Arsdall*, *supra*, 475 U.S. at page 679, flatly prohibited all inquiry into the subject. This was not only unwarranted because some exploration of the permissible scope of U visa cross-examination was needed at that point, but due to the court's unwillingness to consider any additional information, the ruling was made without adequate consideration of the relevant Evidence Code section 352 factors.

The court also expressed considerable concern about the potential for prejudice, but on that issue, too, the record fails to support the ruling. As pertinent here, all the court knew was that (1) Castaneda-Prado and Does 1 and 2 were part of a close family and community network in which there was shared responsibility for babysitting children, (2) Doe 2 is a United States citizen, having been born in the United States, (3) Doe 2's mother, who did not testify at trial, apparently is an undocumented person, and (4) Castaneda-Prado made a successful pretrial motion in limine to exclude any evidence of his immigration status.

Why, against this backdrop, the court believed that U visa related evidence might potentially prejudice either Doe 2 or Castaneda-Prado is unclear. Even accepting the eminently reasonable premise that evidence concerning the immigration status of parties or witnesses is inherently volatile in some communities, we do not think it follows that evidence pointing to the undocumented status of someone in the family and community network of which Castaneda-Prado and Doe 2 were part would inspire feelings of anti-immigrant prejudice specifically toward one or both of them in the eyes of a reasonable jury. There was no evidence in the record that either of them was an undocumented person; no one proposed to

34

introduce such evidence; and any risk of the jury speculating about that possibility could easily have been addressed in a cautionary instruction. While we recognize and see the importance of minimizing any "chilling effect" on the willingness of potential U visa applicants to step forward and apply for benefits,[15] the prejudice prong of Evidence Code section 352 is not governed by generalized policy concerns.

In our view, the bias Castaneda-Prado sought to probe—which had to do with Doe 2's belief that her mother could potentially derive some benefit from the U visa program—did not pose any *substantial* risk of prejudice to any party or witness in this case. The fact that, by statute, Evidence Code section 351.4 limits evidence of "a person's immigration status" in criminal trials makes no difference on this record. There was no danger of the evidentiary filter that statute establishes—requiring an advance, in camera ruling on admissibility before any disclosure may be made in open court of "evidence of a person's immigration status" (Evid. Code, § 351.4, subd. (a))— being violated here. In *Villa*, the court was understandably concerned about prejudice directly affecting the key prosecution witness in the case, the defendant's girlfriend. Any comparable concern in this case was attenuated at best. To outweigh the substantial probative value of the proffered bias

---

[15] See Pritchett, *Shielding the Deportable Outsider: Exploring the Rape Shield Law as Model Evidentiary Rule for Protecting U Visa Applicants as Witnesses in Criminal Proceedings* (2017) 40 Harv. J.L. & Gender 365, 392 (The prospect of cross-examination at trial "can be devastating to the U visa applicant because many applicants have entered the country without inspection or admission and worked without authorization. Answering these questions truthfully in open court can have serious consequences such as alerting Immigration and Customs Enforcement to immigration violations and removability of the witness, as well as admission of criminal liability.").

evidence here, Evidence Code section 352 demanded a more particularized showing of prejudice.

In sum, the trial court improperly discounted the fact that Doe 2's preliminary hearing testimony provided an adequate foundation to inquire into her belief that stepping forward with accusations under oath of sexual abuse by Castaneda-Prado would aid her mother (which meant there was no need for the elaborate exploration of U visa related matters the court believed might be confusing, distracting and time consumptive), and there is no basis in the record to find a substantial risk of prejudice to any party or witness in this case. In the Evidence Code section 352 balance—appropriately struck— the probative value of the proffered evidence of bias here was weighty, and there was virtually nothing of any significance on the other side. We must therefore conclude the court abused its discretion. Because this is not a case in which it can be said that the evidence at issue was of "marginal" relevance (*People v. Brown*, *supra*, 31 Cal.4th at p. 545) or otherwise inadmissible under a routine exercise of the trial court's authority to regulate the limits of cross-examination, we must move on to the second stage of the *Van Arsdall* analysis.[16]

---

[16] The Attorney General argues that, even if the trial court's evidentiary ruling barring any cross-examination on the U visa issue was error, the error was harmless. Here, too, he relies on *Villa*. (*Villa*, *supra*, 55 Cal.App.5th at p. 1054 ["Even if the trial judge had erred by excluding the evidence Doe was seeking a U visa, Villa cannot establish prejudice."].) But *Villa* never reached the last step of the confrontation clause analysis. It is hard to tell what the precise legal basis of the *Villa* court's alternative harmless-error rationale is because the court does not mention *Van Arsdall*, consider the "significantly different impression" test (*Van Arsdall*, *supra*, 475 U.S. at p. 680), or cite to either *Chapman* or *People v. Watson* (1956) 46 Cal.2d 818. As we read the court's opinion, the prosecution's evidence in that case appears to have been strong enough to meet both prejudice

### 3. The Confrontation Clause

Upon independent review of the record, we conclude that Castaneda-Prado has established a confrontation clause violation under *Van Arsdall* because (1) Doe 2's testimony at the preliminary hearing supplied a foundation for cross-examining her about whether she expected her accusations against Castaneda-Prado would help her mother gain an advantage in obtaining a U visa, (2) by granting a motion in limine precluding all inquiry into the topic of U visas and then adhering to that blanket ruling when Castaneda-Prado attempted to cross-examine Doe 2 about whether she expected to derive any benefit from testifying against Castaneda-Prado, the trial court "prohibited [him] from engaging in otherwise appropriate cross-examination designed to show a prototypical form of bias on the part of the witness" (*Van Arsdall, supra,* 475 U.S. at p. 680), and (3) since Castaneda-Prado had no other meaningful way to impeach Doe 2, the court's rulings barring him from exploring the topic might have left a reasonable jury with a "significantly different impression" of Doe 2's credibility than it otherwise would have had (*ibid.*). Much of our analysis on this constitutional issue tracks our Evidence Code section 352 abuse of discretion analysis, but the third point—that Castaneda-Prado was left with almost nothing to use on the subject of bias in his attempted cross-

---

standards. But regardless of how *Villa*'s harmless-error discussion is read, the ambiguity in *Villa* on this point highlights why we have taken care in this case to delineate the two strands of analysis under *Van Arsdall*, one under state law evidentiary standards, and a second, purely constitutional inquiry. In many cases—*Villa* appears to be an example—the distinction will be immaterial. Here it matters. Our resolution of the first inquiry in Castaneda-Prado's favor requires us to reach the second.

examination of Doe 2, which as a practical matter meant her testimony stood effectively unchallenged—goes further.

Of the two young victim witnesses in this case, the testimony from Doe 2 was the most crucial. Castaneda-Prado was able to attack Doe 1's credibility by putting on evidence of her reputation for falsity and manipulation of others. By contrast, all defense counsel had in his cross-examination of Doe 2 were a few discrepancies in her account of what happened compared to Doe 1's account and the fact that Doe 2 testified for the first time at the preliminary hearing that she had complied with Castaneda-Prado's demand to touch his genitals, a new detail that highlighted some of the most incriminating evidence against him. If Castaneda-Prado had been allowed to cross-examine Doe 2 on the topic of U visa related evidence, it would have given him a powerful basis to question her veracity.

Applying *Van Arsdall*'s "significantly different impression" test, we conclude that a reasonable jury, presented with that avenue of attack, could have viewed Doe 2's testimony as the confabulated recollections of a 16-year-old who found a way to help her mother attain legal residency, while also supporting a close friend she believed was experiencing the trauma of recalled childhood memories of abuse that Doe 2 had not in fact witnessed and in fact knew nothing about. *Davis* is instructive. There, the trial court, citing concerns about maintaining the statutorily protected confidentiality of a witness's juvenile record, categorically blocked defense counsel from exploring the fact a juvenile witness may have wished to curry favor with the prosecution to protect his probation status. The high court reversed, explaining as follows: "While counsel was permitted to ask [witness] Green *whether* he was biased, counsel was unable to make a record from which to

argue *why* Green might have been biased . . . . On the basis of the limited cross-examination that was permitted, the jury might well have thought that defense counsel was engaged in a speculative and baseless line of attack on the credibility of an apparently blameless witness . . . ." (*Davis*, *supra*, 415 U.S. at p. 318.) Because defense counsel was permitted to pursue neither line of inquiry, the facts here are even more compelling. Castaneda-Prado's counsel was blocked from asking whether Doe 2 had a previously admitted expectation of deriving benefit from her testimony *and* from making a record as to why she had that expectation.[17]

Moving to prejudice, we conclude the Attorney General has failed to carry his burden of showing that the confrontation clause error here was harmless beyond a reasonable doubt. In so concluding, we take into account not just the disabling effect the trial court's Evidence Code section 352 ruling had on Castaneda-Prado's ability to cross-examine Doe 2, but all the other factors the *Van Arsdall* court outlined as considerations for the *Chapman* harmless-error analysis, specifically "the importance of the witness' testimony in the prosecution's case, whether the testimony was cumulative,

---

[17] We emphasize here that we do not endorse any particular reading of the evidence and we certainly do not intend to weigh in on whether either or both of Doe 1 and Doe 2, or Castaneda-Prado for that matter, testified truthfully. (See *Davis*, *supra*, 415 U.S. at pp. 317–318 ["We cannot speculate as to whether the jury, as sole judge of the credibility of a witness, would have accepted this line of reasoning had counsel been permitted to fully present it. But we do conclude that the jurors were entitled to have the benefit of the defense theory before them so that they could make an informed judgment as to the weight to place on Green's testimony which provided 'a crucial link in the proof . . . of petitioner's act.' [Citation.] The accuracy and truthfulness of Green's testimony were key elements in the State's case against petitioner. The claim of bias which the defense sought to develop was admissible to afford a basis for an inference of undue pressure because of Green's vulnerable status as a probationer."].)

the presence or absence of evidence corroborating or contradicting the testimony of the witness on material points, the extent of cross-examination otherwise permitted, and . . . the overall strength of the prosecution's case." (*Van Arsdall, supra,* 475 U.S. at p. 684.) Doe 2 was, as we have noted, the most crucial prosecution witness in the case; her testimony was not cumulative, since it added new, more incriminating detail to Doe 1's account; and nothing decisively corroborated or contradicted her account. In a case that rested almost entirely on credibility, even more so for Doe 2 than Doe 1 (the pretext call featured by the prosecution, after all, concerned only Doe 1), we cannot say the overall strength of the prosecution's evidence compelled but one conclusion—Castaneda-Prado was guilty as charged beyond a reasonable doubt. Even if the jury chose to believe Doe 1 and not Doe 2, that would have spared him of convictions on two of the five counts against him, not to mention exposure to the multiple victim allegations (which drove the severity of the punishment up significantly).

We also take into account as particularly important to the prejudice analysis the prosecutor's closing argument. In support of the convictions for sexual abuse of both victims, the prosecutor highlighted the absence of any proven basis to question the motives of either Doe 1 or Doe 2. He argued that, in assessing Doe 1's and Doe 2's credibility, there was "a lack of an identifiable reason to lie," and that "no evidence" had been "presented" that Doe 1 or Doe 2 had something "to gain," such as money or an advantage in custody proceedings. As noted, defense counsel unsuccessfully objected to these statements, and, outside the presence of the jury, counsel contended the prosecutor had engaged in "improper argument" because there *was* "a potential benefit and reason to lie" (the U visa issue) that had been "suppressed." After hearing the prosecutor's response (i.e., that his argument

and the corresponding PowerPoint slide were proper because they were focused on "the body of evidence that's been presented in this case"), the trial court overruled the defense objection "with the previous basis being stated" (i.e., the court relied on its earlier ruling that the U visa evidence should be excluded).

Even when a ruling excluding evidence is correct—the underlying evidentiary ruling here was not—it is improper for an advocate to take unfair advantage of the ruling in closing argument, which is what this prosecutor did. "It is well settled that it is misconduct for a prosecutor to base argument on facts not in evidence." (*People v. Mendoza* (2016) 62 Cal.4th 856, 906.) And "[i]t is improper for counsel to assert or imply facts not in evidence that counsel knows excluded evidence could refute." (*Jackson v. Park* (2021) 66 Cal.App.5th 1196, 1214; *id.* at pp. 1205–1206, 1214, 1217 [affirming grant of new trial in civil case based on defense counsel's misconduct in closing argument, including his assertion that evidence of defendant's intoxication did not exist when counsel knew it existed and the evidence had been excluded at the defense's behest]; accord, *Hoffman v. Brandt* (1966) 65 Cal.2d 549, 555 [defense counsel's argument in civil case falsely implying defendant lacked insurance was misconduct requiring reversal of judgment].)

No matter how fervently the prosecutor here believed in Castaneda-Prado's guilt and in the egregiousness of Castaneda-Prado's behavior toward Does 1 and 2, he had no business suggesting to the jury that the absence of a motive to lie was significant to the issue of veracity, when in fact he knew that there was such evidence, having vigorously and successfully fought to keep the jury from hearing it. To put it mildly, the argument was disingenuous. Prosecutors should never assert or imply that there is no evidence on a certain point when they know such evidence exists but was

41

excluded by the court. Such arguments may, in an appropriate case, result in the granting of a new trial motion or an appellate reversal on grounds of prosecutorial misconduct. Castaneda-Prado timely objected to the prosecutor's closing argument on this point, but on appeal he chose not to raise the issue of misconduct; instead, he has framed the prosecutor's closing remarks about the absence of any proven motive to lie as a prejudice argument. While we have no occasion to rule upon any issue of prosecutorial misconduct, we conclude that Castaneda-Prado's prejudice argument is well-taken, in no small part because of the prosecutor's closing argument. (See *D.Z. v. Los Angeles Unified School Dist.* (2019) 35 Cal.App.5th 210, 232 [in a case where the underlying ruling excluding evidence on a certain point is erroneous, a closing argument that highlights the lack of evidence on that point may support a conclusion that the evidentiary error was prejudicial].)

## III. DISPOSITION

The judgment is reversed and the cause is remanded for further proceedings consistent with this opinion.

STREETER, Acting P. J.

WE CONCUR:

GOLDMAN, J.
FINEMAN, J.*

---

\* Judge of the Superior Court of California, County of San Mateo, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

Trial Court:        Superior Court of California, County of Sonoma

Trial Judge:        Hon. Robert M. LaForge

Counsel:            Jeffrey Kross, under appointment by the Court of Appeal,
                    for Defendant and Appellant.

                    Rob Bonta, Attorney General, Lance E. Winters, Chief
                    Assistant Attorney General, Jeffrey M. Laurence, Senior
                    Assistant Attorney General, Donna M. Provenzano,
                    Supervising Deputy Attorney General, and Jalem Z.
                    Peguero, Deputy Attorney General for Plaintiff and
                    Respondent.